On the docket, student dash 17 dash 1044, Marriage of Denotto, Carly Denotto, family known as Carly Denotto, Petitioner McCullough, false affidavit, and Andrew Scott, responding to a student false affidavit. Mr. Peskin. On behalf of the Petitioner McCullough, false affidavit, Mr. John Peskin, on behalf of the responding affidavit, false affidavit, Michael C. Briggins. Thank you, Mr. Peskin. You may proceed. May it please this honorable court. My name is Stephen Peskin and along with my co-counsel, John Peskin, we are representing the epilogue, Carly and Swift. I appreciate the opportunity to appear before this court and answer any questions the court may have. We fully briefed the issues. I do want to focus my remarks this morning on two particular issues. The first is a question of the propriety of the courts finding that the statement Carly made in her first notice of intent to declare dissertation of assets was a judicial admission. The second issue I'd like to discuss, time permitted, is a question of the classification of the business property that Mr. Swift has. In this particular case, the trial court held that Carly's statement in her first notice of dissertation, that the marriage broke down in August of 2014, was a binding judicial admission unless she could show that her husband was, without her knowledge, having a sexual relationship with another woman earlier than that date. The issue is, we believe, whether or not the court could properly draw the conclusion that the statement made in the notice of intent to disclose the dissipation of assets is the type of statement that is properly a judicial admission. Would you agree that every case in divorce is sui generis? Yes. And under the circumstances, there are a lot of unusual facts and circumstances involved in this case, things like cocaine use, heart attacks, text messages to the child that supposedly were not discreet, and that there were things that your client was aware of that, as she decided, could have been grounds for a dissolution earlier than 2014? I believe there are many grounds for a dissolution, yes. So to answer the question, she could have filed for a dissolution of marriage at any time. She could have invoked irreconcilable differences at any time. And so, regardless of whether the notice of dissipation was in 2014 and indicated that she was claiming that period or that date, if the evidence establishes that she had reconciled with him virtually up to that point in time, doesn't that kind of moot the issue about whether or not there was or there wasn't a judicial admission? And wouldn't it also moot or disprove the argument that if she knew that her husband was having sexual relations with a third party, which she may have known intuitively or otherwise? What I'm getting at is this isn't just a situation where the trial court made a ruling as a matter of law regarding procedure or a substantive procedural ruling relative to what it was an admission. There was a trial, and there were facts presented, and the court made findings, did it not, as to whether or not the date was appropriate under the circumstances. And those circumstances would relate to reconciliation, expiation, and so on. Well, I think, if I may, I think I understand your question as being whether or not her conduct was in the nature of a condonation of her husband's behavior, which would set the clock further down the line as far as when the marriage starts irretrievably breaking down. And I guess my comment to that is that it is ultimately a legal conclusion that the court needs to reach based upon the totality of all of the circumstances as to when this marriage starts to irretrievably break down. And you don't think the trial judge did it in this case? Frankly, I think the trial court made some confusing and, at times, inconsistent findings on this particular subject. We were questioning what Mr. Swift's sexual relationship with another woman had to do with the ultimate issue of whether or not this was a judicial admission, and that was one of the questions that we had about the court's ruling. Well, maybe, I mean, in my mind, as I read that, I don't like that term, judicial admission. I don't think that makes a lot of sense in this case because if there were facts otherwise and if there had not been a sequence of events that we saw in this record, I think the court could have made a finding that I was wrong, this isn't a judicial admission, these are the facts. But what we see here, what we really need to find out is do we have an irretrievable breakdown of this marriage? She stated the date, August of 2014, and prior to that time, she had knowledge and she admitted to certain inappropriate conduct on his part, the use and spending of many dollars weekly for cocaine, but then there was the heart attack, which caused her to have a different feeling about the relationship. So even if it had broken down before, it appears that there was her decision to stay and to help him based upon her own background as well as what she felt was an obligation. So how could we, at a minimum, get beyond the heart attack, go back beyond the heart attack? I would speak to that from a public policy perspective, Your Honor, because what the policy would require is for a litigant to preserve any claims that he or she has of their spouse's waste during a period of time that the marriage is undergoing some trauma of some sort. And the spouse is ambivalent. I mean, human nature is we're a little uncertain about what we want to do emotionally at times, and this was an unusual circumstance with her being an RN and him having a heart attack and staying to be a caretaker, at least for a period of time. I don't know that that as a matter of policy should preclude somebody from being able to claim waste that occurred earlier if the marriage was ruptured, particularly by that spouse's conduct. But this record also does reflect that after that caretaking, they continue to have a lifestyle that included vacations, albeit with some company on those vacations. And I'm assuming that they also had a sexual relationship that is part of a marriage relationship after he became better. That was not part of the record. We could draw that conclusion, but that was not part of the record. But we have to have an irretrievable breakdown of the marriage. That's the issue. And normally it relates to some event. And the event here, if I'm correct, was some of the things showing up on the son's phone because the phones are synced or something of that nature. I don't pretend to understand the technology, although I would have loved to have looked into my son's phone on a regular basis when I could have. So, you know, how can we go back when it's very obvious at this point this is the issue? I would only say to the court that the law provides, and I think Holthaus, a case that this court had decided, clarified that the salient date is when the marriage starts undergoing an irretrievable breakdown. And I think it's not an unfair conclusion to say that this marriage started an irretrievable breakdown earlier than August of 2014, based upon the facts. And in fact, Judge Bush made that finding that it's clear that it did. The question really I think that Judge Bush raised, and I believe Justice McLaren was alluding to, was did her conduct in not divorcing him, was that a form of condonation, wiping out the earlier conduct or the earlier breakdown that occurred? I would suggest to the court not, if we follow the Holthaus principle, because it's a continuum. And again, with all marriages, I'll speak as a practicing divorce lawyer every day, there is a lot of ambiguity and people are uncertain on Tuesday. On Wednesday, they love him. On Thursday, they want to kill him. And this is not uncommon. And this just happened to go on over a longer period of time perhaps. But I don't think that it's an unfair conclusion to say that this marriage really was ruptured. It started when Mr. Swift engaged in his extracurricular conduct earlier on. So is that the focus then? I mean, the infidelity is the primary factor that would determine that the marriage is broken and does it matter that maybe initially she didn't know about it versus if she didn't know about it? Well, we raised that issue in the trial court. And one of the defenses to the judicial admission was how can she state as a matter of fact when the marriage is breaking down if she was unaware of certain conduct that her husband was engaging in? That's really an illustration of why this is such a murky topic, because when does the marriage start undergoing a breakdown? I mean, what he thinks is the date is different than she thinks is the date. It's different than the trial court thinks is the date. You're saying that the breakdown can be based upon either spouse's perception. I'm saying that the breakdown is a legal conclusion that the trial court needs to determine weighing all of the evidence in the case and make that finding. Well, let's take a hypothetical and let's say that ten years from 2014 back to 2004, the husband has been depositing monies on the sly in secret accounts that she doesn't even know about, and has been spending money not only on websites but at casinos and whatever his heart desires. So is that to be factored in? Can that establish that the marriage is irreconcilably broken down because of the fact that his deceits, his expenditures of marital property in a very avaricious, self-centered, egocentric way? Or is it not relevant and material? I think those are factors that properly a trial court would be considering in targeting the date that the marriage commenced an irretrievable breakdown. So I do think those are relevant factors along with infidelity and there's a lot of other factors. Is there a limit on the number of notifications that can be filed in anticipation? Not by statute. It's an exercise of the court's discretion to allow? Or is it the court's discretion to strike based upon a motion filed by the opposing party? I don't know that I agree with that, Your Honor, respectfully. I think that I can file a hundred notices because the purpose of the notice is simply to advise the other side. I'm going to raise this issue at trial. Now, at that point, I think a trial judge, for whatever reason within his or her discretion, could say, no, we're not going to allow you to proceed on whatever dissipation claim that you're trying to proceed on. But I think you could serve multiple notices because, again, the purpose is simply to say to the other side, for due process sake, we're going to raise this issue at trial. There are instances I think I've read where there have been post-nuptial agreements that were supposed to resolve a breakdown in marriage that was supposed to then rehabilitate the marriage so that with this post-nuptial agreement, whatever transpired before that period of time would become irrelevant. Have you ever witnessed that or read about it? I have not, but I do know that it's proper consideration in a post-nuptial agreement to stay married in consideration for not misbehaving one of the spouses. So, for example, I'm not being very articulate, an agreement in a post-nuptial agreement could provide that I'll agree not to divorce you for a period of five years, but in the event that you have an extramarital relationship, I can proceed immediately and you forfeit rights to certain property. I know that there have been cases that have affirmed that type of post-nuptial agreement. There was none here, of course, but hypothetically, parties could contract to do that. There are some definitions of irretrievable breakdown of marriages in cases. There doesn't seem to be any within the statutory authority specifically, but it talks about not a gradual process, but it's when, and it would be the party saying there was an irretrievable breakdown, perceives that irretrievable breakdown. And I think that might be that Romano case and maybe not Holthaus in particular, but it's someone's perception and it would be someone who was impacted by that irretrievable breakdown, which in this case would be your client. And she said that it occurred in 2014, even though as you did discovery, it went back. But don't we have to look at what she perceived at the time was the breakdown as opposed to what he might have done to cause the breakdown? If the court is asking about this in the context of the law of judicial admissions, I would simply say that that may have been her opinion on that day, but an opinion is not sufficient to serve as a judicial admission. And also, again, as the court alluded to, her opinion changed over the course of the discovery process. And I think people can look at certain data differently at different times and something that might not have necessarily registered to me at one point may, after I see various other revelations or disclosures at some point in the future, might be more meaningful later. Well, I mean, let's call it what it is. We have a $36,000 dissipation or we have $1,200,000. I know how I feel about that, but I'm not the one experiencing the irretrievable breakdown. It was your client who said it occurred in July of 2014. Correct? She did. She did. I would just add to that, Your Honor, that that's the whole heart of the case, whether or not she's entitled, based upon new information, to amend that or to reconsider that. That we're arguing she is. I don't have any other questions. We're going to get to another issue, and I'd like to cover it quickly if you could. Thank you, Your Honor. The issue is whether or not the court's classification of the Pleasant Drive property was accurate in determining that it was Mr. Swift's non-marital property. We would argue to the court that that was not a proper classification. The facts underlying that acquisition were that Mr. Swift had entered into a contract with his father to purchase both the non-marital business, Cushoneer, as well as this property. That was done before the marriage. After the marriage, Mr. Swift decided to execute on that contract and purchase the Pleasant Drive property. He asked his father to amend his option so that the purchaser would no longer be Cushoneer under the original option and would be Swift Properties LLC, an LLC that was formed and created after the party's marriage. Title was then taken by Swift Properties LLC after the marriage, and we are arguing that because that was classified as a marital business and that marital business took title to that property, it would be a marital asset. And the trial court said no. Why? The trial court argued that the contract was the seminal or critical linchpin in determining that this was to be a marital or non-marital property. So because the contract was executed before the date of the marriage, it would be a non-marital asset. And I think that respectfully, I think the trial court may have made some comments in its findings that suggested that the property was owned by the non-marital business, and it wasn't. There was clear testimony by Mr. Swift that he had an option originally that his business was going to buy it and then paid his father approximately $50,000 to transfer that option into this new LLC. He will argue in all likelihood that this LLC was only created to assist me in saving taxes with my non-marital business. But respectfully, that's not a 503 factor. The intent of the party creating a business is not an exception to the presumption that an asset is marital property. Well, counsel. Go ahead. I was going to ask, does the record reflect specific evidence as to what funding was actually used to purchase this business property and what the date was in which that was done? There was Mr. Swift's testimony saying that after negotiating to get the new option for Swift Properties LLC, I paid my father $450,000 in 2009. And where did that money come from? In 2009. After they were married. Okay. And the source of those funds? We don't know. That was not in the record. Well, even if they were from Kushner, money earned after the marriage would not necessarily be non-marital. That it would be marital property, correct? I hope so. I think in all fairness, I think if Mr. Swift could tie up that these were from distributions from his non-marital business that were not related to his efforts at the business, he could make that argument. I would say to the court, though, he never connected the dots at the trial. He never told us what funded the LLCs. He told us why it was created, why both of them were created, but not where the money came from that was in there. That's true. It was very murky. And he did have certain other interests like gambling and things of that nature, correct? Yes. All right. Any other questions? Thank you. Thank you. You'll have an opportunity to make the bubble. Thank you. Mr. Doyen. Thank you. Is that how to pronounce it? Yes. Exactly. Good morning. Good morning. May it please the court, I'm Mike Doyen. I'm arguing on behalf of Andrew Swift, who is the FLE but also filed a cross appeal in this matter. I'd like to start with the classification of property issue because I think a resolution of that issue spills over to the dissipation and the maintenance issues. One point I'd like to correct Mr. Peskin slightly on, there was substantial evidence in the record as to the source of funds to buy the business real estate and also how Swift equipment leasing was funded. Mr. Swift's testimony, which was unrebutted, was that he did not ... There was no down payment for the real estate. It was all part of the original package deal for Cushner Inc. that included the option to purchase the building in real estate where Cushner Inc. operates. When it came time to exercise the option, two things had happened. One, his father had sold an out parcel that was adjacent to the business property during this period of time. Mr. Swift was negotiating for a lower price because it wasn't the same amount of land as it had been. Second, he did not want Cushner Inc. to hold title. He wanted to create an LLC to hold the title. He negotiated that with his father. The LLC, Swift Properties LLC, took title. There was no down payment. The only monies that ever went into Swift Properties LLC was rent payments from Cushner Inc. and then Cushner Inc. made the loan payments directly to his father. His father held the mortgage. There was no financing. There was no payment of the purchase price at the time of the purchase. It was just seller financed. Well, how are the rent payments ... You're saying those rent payments were non-marital. Is that correct? Correct. But that's income derived during the course of the marriage from a non-marital business. That could clearly be marital money. That's why it could be, but under the facts of this case, it was not. How? We had an expert witness who came in. Basically, what we're looking at is all revenue of this whole case, marital and non-marital, all derives from Cushner Inc. There was no other source of revenue or income other than Cushner Inc. We know that the annual income over the past several years prior to the trial was about $600,000 per year. The critical determination is how much of that income was marital and how much was non-marital. We had our expert witness, Mr. Coffey, testify that Mr. Swift was over-compensated for his personal efforts throughout that entire last five years because he, in effect, was semi-retired. He was only working actually at the business about eight hours a week, but he continued to pay himself a salary of $120,000 per year. Just that base salary that was going into the household account was over-compensation for his efforts until 2016 when he went back to work, basically full-time. So the rest of that income is non-marital income. I'd like to make an analogy. Well, one, if you look at the Hebroy case with regards to the real estate, it's right on point. Hebroy, two brothers operating the family business, which they had received from their parents prior to the marriage, purchased the real estate where the business operates from their parents. They take title under individual names, and the rent is actually paid to Mr. Hebroy and deposited into a joint marital account. That's not even disputed in the facts of that case. Mr. Hebroy's position was I only moved the rent money each month from the business to the joint account so that I'd have the money in the joint account to pay the monthly payment due for the real estate. So the money went from the business to the party's joint marital account, then went to the parents to pay off the loan for the purchase of the building. And the trial court and the appellate court affirmed said just the fact that the money moved through the joint account does not create a marital property interest. The fact is there were no marital monies used to acquire the business. All of the money derived from the rent payments from the business, just like in this case. So the question becomes is the money that was coming out of the business to pay the rent, under what theory could that possibly be marital property? And to give an analogy, if Mr. Swift at the time of the Cushioner Inc. that he had paid $3.3 million for, which included the purchase price of the real estate, had had that much money in investments, any earnings on those investments would have clearly been non-marital without any question. If he decided to diversify and move the money around, create new accounts, so long as the money all came from that original $3.3 million, there would be no issue as to whether it was non-marital or marital. The only difference in this case is that Mr. Swift is involved in the operations of the business. So we have to address this issue of income attributable to his personal efforts. But it's clear from the record that the money that came out of Cushioner Inc. for the benefit of the family far exceeded the value of Mr. Swift's personal efforts. Not only did his base salary exceed the value of his personal efforts, the profit bonus that he did each year on June 30th that wasn't even actually distributed out to him was clearly just a transfer of the profit of the business to him so that it would show up as personal income rather than income to the C Corporation. Did he pay taxes on it? Yes. Did he pay it back? Did he pay that money back since he was overcompensated? No. Each year there was a loan from a shareholder that went, so he put the money back into the business, but then over the course of the marriage, that shareholder loan continued to pull money out of the business for the family, so it basically kept bringing that shareholder loan balance down to zero. So the point being, it would be no different than what's in the Samarja case. The record in that case is brothers who were running the family business took out profit bonuses, which were then loaned back to the company. Even though that showed up as income to the individual brothers, the trial court found and the appellate court affirmed that it was really income of the business that was distributed out and then loaned back, so there was no marital income. They had the account for the business testify that the amount of the bonus was calculated based on the profit of the business for that year, completely unrelated to any work any of the brothers did for the business. It was solely based on their ownership interest in the business, which was not marital. So it was income of the business, not personal income of the spouse. So in this case, we have an overcompensation of Mr. Swift. We're not asking to get that money back. Obviously, he voluntarily continued to draw money out of the business. Theoretically, he could have paid himself a salary of $120,000 and left everything else inside Kushner Inc. As far as the operations of the business, it wouldn't have made any difference. The only difference to Mr. Swift would have been each year he would have been taxed at the corporate level because it was a C corporation, and then if he ever did decide to pull money out of the business for the family or for whatever reason, it would be taxed again as dividends. So the focus shouldn't be on the tax ramifications because a lot of the case law says that's irrelevant. Who controlled that ability to pay him? Mr. Swift. Right. So he could do whatever he wanted to with that money. Claim it as his own. Claim it as the business's. He could have made whatever decision, but his decision was to take that money and use it for family and stuff. Correct? Right. And we're not asking for any of that back, but what we're talking about is the first, the status of Swift Properties LLC or Swift Equipment Leasing LLC as marital or non-marital property. Judge Bush in his findings in the judgment makes specific findings. It's C-375 is the actual judgment where he makes his findings. The findings he makes, if those findings were to follow the statute, that would be a finding that these two entities were non-marital property because he said they were shell entities formed solely to facilitate the operations of the non-marital business. There was absolutely no evidence that any marital monies ever went into either of these entities because, again, we're talking about the only marital monies are his base salary, which wasn't even enough to cover all of the monthly household expenses, which is why he had to supplement the household account by moving money from the two LLCs. And certainly none of Carleen Swift, formerly known as Swift, none of her income ever went into either of these LLCs. It was only, and it made no difference to the operations of Kushner, Inc., whether they bought the equipment under the name of Kushner, Inc., or whether it was titled to Swift Equipment Leasing, and Kushner, Inc. made lease payments to Swift Equipment Leasing. The whole point was simply to avoid the double taxation. So tax consequences are not determinative of whether property is marital or non-marital. The question is, where did the income derive from? And it derived from the operations of Kushner, Inc., except to the extent Mr. Swift had to be compensated for his personal efforts. So the only way we even get to this issue of whether any of this money that was paid as rent to Swift Properties or paid as lease payments to Swift Equipment Leasing is whether or not Swift was undercompensated through salary. And it's clear from the evidence that he was not undercompensated. He was more than fairly compensated for his personal efforts. All of that other income, then, is non-marital. Swift Properties LLC is non-marital. The business real estate is non-marital. And Swift Equipment Leasing is non-marital. And that means those two accounts that were ultimately divided are non-marital. During the course of the marriage, it was never treated that way. It was all his income from whatever efforts. He owned Kushner. It's non-marital. He takes and took whatever amount of money he wanted to out of there. No, not really, Your Honor. Well, how did he pay the bills at home? He paid rent to Swift Properties, and then money would accumulate in the Swift Properties account. And again, our position is that it doesn't ever touch the marital estate. And it's not his income. It's Kushner's income that's going into Swift Properties. Same thing with Swift Equipment Leasing. The money would be transferred to Swift Equipment Leasing to pay lease payments. That's non-marital. It stays non-marital. He paid himself a salary. The money that was typically, and this leads to the dissipation claim, too, that was typically used to supplement the household account was the monthly shareholder loan payments. And the evidence was is that that was a separate check that the company could afford it. But it was generally a set schedule each year. And from that money, he would take approximately $5,000 a month cash, which would basically be his spending money for whatever he wanted to do for that month. And then he'd put the balance, $10,000, $12,000, whatever it was, into the household account. So the money to fund the family lifestyle, to pay the mortgages and everything else, car payments, was his base salary of $120,000 a year. And the monthly shareholder loan payments, less the $5,000 that he took out in cash. And our position is that was a contribution he voluntarily made of his non-marital money to the marital estate on a regular basis, which he is not seeking to get back. But nothing about that creates a marital interest in Swift Properties or Swift Equipment Leasing LLC. Did Cushonier make the $35,000 payment to, was it Mrs. Farley? Or was that from an account that he held? There's evidence in this record that there was a... The monies that he was spending, he never used the money from the joint household account to fund any of his extracurricular activities. But he took money from Cushonier to use personally, whether it was due to his personal contribution or just because he wanted it. And in one occasion, there is evidence in this record that he took a fair amount of money from somewhere and gave it to her as a loan that we don't know was ever paid back. That's still his money. No, it was Cushonier and Inc.'s money that was transferred to Swift Properties and Swift Equipment Leasing. Just as if he had a $3.3 million investment account that was clearly non-marital. If he wanted to take $35,000 out of that, that's his money. It's not marital money. It's his money. And pay it to a woman to buy cocaine. That's not dissipation because he took it from a non-marital account and spent it. The only way it becomes dissipation is if the source of the funds was non-marital. Cushonier, Inc.'s income, by definition in the statute, is without question non-marital. The only way any earnings of Cushonier, Inc. becomes marital is if the income is directly attributable to the personal efforts of Mr. Swift. The way to address that question is to whether or not he was compensated. There's several cases that... His personal efforts only became an issue when the divorce happened. It was not an issue prior to the time of the divorce. Was it, Mr. Dorian? Well, I don't know if you understand what I mean. The point is, throughout, he was always adequately compensated. He was never... He never failed to compensate himself and keep money in the business. He always overcompensated himself. I mean, we had the accountant go back the last five years but the record was clear that he always accurately compensated himself, even before the marriage. He had this system set up where he paid himself his salary and then he took the profit bonus every June 30th. Why would the maintenance be reduced if that were the case? Because income from non-marital sources is still relevant for purposes of determining maintenance. It's income of the spouse, not marital versus non-marital income. So he's got $600,000 in income for purposes of determining maintenance because his non-marital income is income under Section 504 for purposes of calculating maintenance. So the issue here is the two accounts tied to real estate and this dissipation claim because, as I said, $5,000 a month cash each month, we argued that really it was consistent with their lifestyle, the vacations they took and the things they did to spend that kind of money but also it was directly kept from the profit distributions each month, which was non-marital profit. A lot of the credit card charges, Bank of America and American Express, which were part of the court's dissipation claim, were always paid. He said those charge cards were never paid by the joint or household account. They were always paid. One was paid through Swift Properties LLC and the other was paid through Swift Equipment Leasing LLC. So the only question your honors really have to answer is was there anything about the revenue and income generated by Kushner, Inc. that was directly attributable to Mr. Swift's personal efforts that he was not adequately compensated for? And the answer to that question is no. So except for his base salary, everything else is non-marital income. Everything that flowed in from Kushner, Inc. to Swift Properties is non-marital. Everything that flows in from Kushner, Inc. to Swift Equipment Leasing is non-marital. As Judge Bush correctly found, the entities were formed with no assets. If you read Steele, which is out of this court, but also Eddy and Hebroi, the facts of this case much more lend themselves to a finding that these are all non-marital entities because in Hebroi, he used a joint account to pay the mortgage payments to his parents. In Eddy, they didn't just form an ancillary business to facilitate the operation of the core business. They bought 25 McDonald's branches. He said that there were no funds used to create these accounts. So if there were no funds to create them, then there could not have been non-marital funds used to create them. That's not the question. The statute doesn't say what funds were used to create them. And if you, Eddy and Steele, go through exhaustive determination of what monies flowed into and out of them, and the testimony at trial by Mr. Swift, which was not rebutted, was that the only money that ever went into Swift Properties was rent paid by Kushner. That's the only source of the funds. That's all non-marital funds. Just if you opened a bank account, the day you open the bank account, maybe you put $10 in it because the bank has to have something on deposit, but then you move a million dollars from your $3.3 million non-marital account, that account is open during the marriage, but it's funded by non-marital money. That makes it a non-marital account, not the fact that it was created. There's no bank account or an LLC. They're not created with assets. The owners have to put assets into them. So you're saying that things that are created that aren't created with marital property are non-marital property? Well, I mean, if you just had a shell entity, who cares whether it's marital or non-marital or not because it has zero value. So at the day they're formed, they have zero value. It doesn't make a difference whether they're marital or non-marital. The determination as to whether they're marital or non-marital is to identify the funds that went into the businesses. That's exactly what happened in Eddy. They formed whole new corporations that were completely unrelated to the original Eddy Farms business, which was farmland in the Midwest and you're buying McDonald's franchises in Florida with very little money from Eddy Farms and mostly financing. And it was held that those are non-marital because it was all derived from the seed money from Eddy Farms, which was non-marital business. What about the possibility that the entities are non-marital but the funds that were placed in them were marital? The only way they could be marital was if the rent that Kushner Inc. paid to Swift Properties was income attributable to the personal efforts of Mr. Swift and there was no evidence of that on the record at all because what we're doing is we're taking what's done for federal tax purposes which is really not any part of the analysis under the statute. So if Kushner Inc. were entitled to the business, they would pay the mortgage payment to Mr. Swift's father and the difference between what they were paying in rent and what the mortgage payment was would end up being income of Kushner Inc. on Kushner Inc.'s tax return. So if the only thing we're doing is moving that taxable income from Kushner Inc. to Swift Properties LLC so it'll show up on a K1 on the personal return instead of income on the C Corporation's tax return, that has nothing to do with the determination of marital or non-marital property. It's income derived from the non-marital property of Kushner Inc. There's no way for that to become marital. The same thing with the lease payments to Swift Equipment Leasing. As Mr. Coffey testified, there was absolutely no reason why Kushner Inc. couldn't take title and just make the lease payments directly. The only benefit was to move the income from the C Corp to the LLC so it would show up on a K1 and pass through the personal income tax return. Okay. Thank you. Your time is up. Thank you. Mr. Peskin, you may proceed. Thank you, Your Honor. Respectfully, Mr. Doyen's recitation of the clarity of this record is not found in the record and I want to give the Court one example. Page 324 of the record, it was testimony of Mr. Swift at trial. I asked this question, how do you decide which account you're going to use to pay a personal bill? Answer, some are decisions I make when I set up automatic bill paying on recurring. Some are based on using accounts that are non-marital to cover personal expenses. Some are based on balances that are being held at the current time. Question, would you agree that the three accounts are basically interchangeable as being used to pay personal expenses? Yes. That's a good illustration of the murkiness of how Mr. Swift engaged in business. And I'm not saying that in an illegal way. It's just his recordkeeping. Everything was bundled together and mixed up and I would remind the Court that it is his burden to show the trial court by clear and specific evidence the exceptions to the presumptions which are that anything acquired during the marriage is marital property. Mr. Doyen relies on the Eddy and the Steele cases to suggest that these LLCs which were created during the marriage should be classified as non-marital property. They're distinguishable because in both Eddy and Steele there was contributions from a pre-existing non-marital business to the acquisition of a new business here. He formed one LLC to take ownership of the Pleasant Drive property that was created during the marriage. Cushonier leased that property and paid the LLC rental payments. That money was used in part for the family. That was one of the three accounts I just referenced before. The second was Swift Leasing created after the marriage. Mr. Swift bought equipment and property that he leased back to Cushonier that was bought during the marriage and owned by an LLC that was created during the marriage. There are no exceptions to 503 that would classify these as non-marital property. Cushonier didn't pay for these businesses. There was no evidence of that. Mr. Swift never did. Mr. Doyen did a marvelous job of reciting this, but Mr. Swift never did. In the record, Mr. Swift never talks about tying up and tracing this money and it's his burden to do that. I would respectfully suggest that in some ways it's a little bit of a red herring to make these sorts of arguments because the clear lie is, the presumption is that everything is marital property that's bought during the marriage. The LLCs are both formed during the marriage. The commercial building was purchased during the marriage by one of the LLCs that was formed during the marriage. Would you agree with counsel that even if these Swift companies were created during the marriage, if they had no assets in them at that time, they wouldn't either be marital or non-marital, or even if they were marital, it's the income that went into them and out of them that Mr. Doyen said is determinative. And he explained why, what income went in and went out and why that showed they were non-marital. What part of that do you disagree with, counsel? Respectfully, Your Honor, I don't I'll give the court a hypothetical response because if a lottery ticket was purchased by one of these LLCs, the proceeds, I think, would be considered marital property if the LLC was considered a marital asset. If the LLC is a marital asset and he conveys money to the marital asset, there's some consideration for that transaction. The consideration is the cushioneer non-marital money is deriving a tax benefit. I don't know if I'm answering your question. Not as directly as I would like. I think I'd like the, instead of the hypothetical, I mean, as I understand it, it's the rent payments that went in to these accounts. It was. Right. Well, the rent is from cushioneer. From the prop, right? Yes. So that's non-marital. Is it not? I respectfully don't know that I agree with that. I do think that it derived from a non-marital source. I certainly agree that it derived from a non-marital source. But I don't know at the point that the check is written to this entity, which we would describe as a marital asset, that it automatically maintains its characterization as non-marital money after the transaction has been consummated. Why not? Because I think it's a contractual arrangement that So what consideration was there that would change it in this case? The consideration would be that cushioneer is deriving a tax benefit by sheltering money in a business that was created during the marriage. That's the consideration. I mean, there is consideration for that transaction. Right. But supposedly the tax benefit isn't determinative, is it, in deciding whether something is marital or non-marital? Whether something derives a tax benefit? No, I agree with that statement. I don't think that the tax benefits affect classification, but I think, to your question, I think it goes to show why we would argue that the source of the money that goes into a marital business is not retaining its classification as non-marital. And that's because there's a tax benefit that is derived? Yes. Well, I'm just saying that there's a contract between non-marital and marital businesses. And it is a contract that has consideration, and the consideration is the marital business gets the money, the non-marital business gets the tax deduction and pays less tax. Now, he happens to be also the owner of the marital business, so he gets it on both ends, but it's still a valid contract. Okay. Thank you. Do you see the merit to his argument relating to maintenance having been affected in a substantial manner based upon the alleged erroneous ruling of the classification of the two LLCs? I don't know that that affects his income for the purposes of maintenance, which would be the same regardless of the classification of the LLCs. The point is, is he still has the same number of dollars in his pocket, and therefore, his ability to pay, not his ability to pay vis-a-vis some sort of ratio between marital and non-marital property. True. Yeah, I think Section 504 would look at any resource he has in evaluating the propriety of an amount of maintenance. Thank you. Any other questions, Your Honor? I don't have any. I believe, though, that since this is a cross-appeal, Mr. DeWayne may have five or ten minutes. Thank you. Thank you, Your Honor. I'll just address this point of the record. Mr. Swift testified at length at the trial, some under direct exam, some under cross-exam. I would suggest to Your Honors that the excerpt that Mr. Peskin just read is definitely accurate, but somewhat out of context. But even if you take what he said, there's nothing in what he said that creates a marital property interest. Spending non-marital money for marital purposes does not create a marital property interest. Spending non-marital property for a non-marital purpose does not constitute dissipation. Do you have any case citations or statute for that particular point? Spending non-marital funds for non-marital purposes is not dissipation. That's Burberry and Burberry and Foster. And Foster, again, the husband had financial accounts. It wasn't a business. But he, just to pay the ordinary household bills, he had to transfer money from his non-marital accounts into the marital accounts. Then he would also transfer money from his non-marital accounts to spend on things for himself. And the trial court found, and the appellate court affirmed, that that couldn't be dissipation because he was already transferring money from his non-marital funds to cover the household expenses. So anything additional from his non-marital money that he wasted wasn't dissipation. Well, it might not have been dissipation, but it was still income, his income. Well, I, for purposes of calculating maintenance, I agree. Non-marital income and marital income is considered the same for purposes of maintenance. But for marital property and non-marital property, it's a huge distinction. And the totality of Mr. Swift's testimony was that he set up the household account specifically to pay household bills. That was generally the account that would run out of money. So he would generally transfer money from Swift properties to the household account or from Swift equipment leasing to the household account. There were also occasions where he would transfer money between Swift properties and Swift equipment leasing. Over a period of 20 years, or however long it was, he did acknowledge that he wasn't going to swear that there was never an occasion that he transferred money from the joint household account and usually it wasn't joint, it was joint for a period of time, to one of the other accounts. He couldn't say that it never happened, but he said the household account was to pay household bills and generally I would be moving money from the non-marital Swift properties and non- marital Swift equipment into the household account because we were spending generally more than what I was receiving in my base salary or even receiving in the profit bonuses. And I would cite back to that Samarja case because the trial court just dismissed that case entirely but it clearly said that a payment to the spouse based solely on the income of the non-marital business, even if it's paid as a bonus, is not marital money. It's not compensation for his efforts. It's just a way to transfer money out of the business and in that case also it was loaned back. So the characterization, the income either shows up on a W-2, a K-1, or the corporate tax return, but it's the same $600,000 and the determination of what is marital and not marital is based on the revenue of the business and what is fair compensation to Mr. Swift for his efforts. That's the analysis of this court, not whether or not it ended up being reported on a K-1 or a W-2 or the C-Corp tax return. That is tax planning. What we're supposed to be focusing on is the actual transactions and what happened is he received a $120,000 salary and then to disperse the income of the C-Corp out, except for $50,000 or so a year, he dispersed money out to the two LLCs, so it would show up on a K-1, pass through to the personal return, and he paid himself a profit bonus that showed up on his W-2. But those monies were non-marital income of cushionary. Thank you.